IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHAEL KUEBER, | § | No. 5:15-CV-382-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF SAN ANTONIO, | § | |
| | § | |
| Defendant. | § | |
| | § | |

ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; AND (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

Before the Court are two motions: (1) the City of San Antonio,

Texas's ("the City" or "Defendant") Motion for Summary Judgment (Dkt. # 19);

and (2) Michael Kueber's ("Plaintiff") Motion for Partial Summary Judgment

(Dkt. # 22).  The Court held a hearing on the competing motions on July 7, 2016.

At the hearing, David E. Kirkendall, Esq., represented Plaintiff, and Shawn K.

Fitzpatrick, Esq. and Deborah Lynn Klein, Esq., represented Defendant.  After

careful consideration of the supporting and opposing memoranda and the

arguments presented at the hearing, the Court, for the reasons that follow,

(1) **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 19); and

(2) **DENIES** Plaintiff's Motion for Partial Summary Judgment (Dkt. # 22).

<u>BACKGROUND</u>

The facts in this case are undisputed.  The City has a Charter that outlines its form of government and its powers.  (<u>See</u> San Antonio, Tex., Charter art. I (1951); Dkt. # 19, Ex. A.)  Under the Charter, a city council consisting of 11 members governs the city.  (San Antonio, Tex., Charter art. II, § 4 (1951); Dkt. # 22-1, Ex. A.)  The Charter requires election of its council-members from ten single-member districts[1] and that the single-member district boundaries be re-drawn following each federal decennial census.  (San Antonio, Tex., Charter art. II, § 4 (1951).)  Additionally, and at the center of the issue before the Court, a 1997 amendment to the City Charter states that single-member districts "shall be as nearly equal in population as practicable."  (San Antonio, Tex., Charter art. II, § 4 (1997); "1997 Amendment," Dkt. # 19, Ex. B.)

After the 2010 Census, it became apparent that there was a substantial population imbalance among the various council-member districts as reflected by the new census data. ("Letter to DOJ," Dkt. # 19-7, Ex. G at 5.)  At that time, the ideal district population was 132,672, but the 2011 council-member districts consisted of the following populations, with a total deviation of 39.93 percent:

---

[1] The eleventh council member serves as the City Mayor and is elected in a city-wide election.

| 2011 Benchmark Plan | | |
|---|---|---|
| **District** | **Persons** | **Deviation from Ideal** |
| 1 | 112,466 | -15.23% |
| 2 | 123,727 | -6.74% |
| 3 | 118,848 | -10.42% |
| 4 | 123,256 | -7.10% |
| 5 | 106,608 | -19.65% |
| 6 | 152,661 | 15.07% |
| 7 | 137,292 | 3.48% |
| 8 | 159,578 | 20.28% |
| 9 | 159,189 | 19.99% |
| 10 | 133,096 | .32% |
| **Totals** | 1,326,721 | 20.28% - (-19.65%) = **39.93%** **(Maximum deviation)** |

(Id.)  Due to this imbalance, the City decided to redraw the council-member districts and retained legal counsel to do so.  (Dkt. # 19, Ex. D.)  On September 15, 2011, the city council passed a resolution providing the criteria and standards by which the redistricting plan would be evaluated and approved.  ("2011 Resolution," Dkt. # 19, Ex. E, § 1 ¶ E.)  Such criteria were:

> A. Where practicable, easily identifiable geographic boundaries should be followed.

> B. Communities of interest should be maintained in a single council-member district, where practicable, and attempts should be made to avoid splitting neighborhoods.

3

C. To the extent practicable, districts should be composed of whole voting precincts. Where this is not possible or practicable, districts should be drawn in a way that permits the creation of practical voting precincts and that ensures that adequate facilities for polling places exist in each voting precinct; and splitting census blocks should be avoided.

D. Although it is recognized that existing districts will have to be altered to reflect new population distribution, any districting plan should, to the extent practicable, be based on existing councilmember districts.

E. Districts shall be configured so that they are relatively equal in total population according to the 2010 Census. In no event should the total deviation in population between the largest and the smallest district exceed ten percent.

F. Districts should be compact and composed of contiguous territory. Compactness may contain functional, as well as a geographical dimension.

G. Consideration may be given to the preservation of incumbent-constituency relations by recognition of the residence of incumbents and their history representing certain areas.

H. The plan should be narrowly tailored to avoid retrogression in the position of racial and language minorities as defined in the Voting Rights Act with respect to their effective exercise of the electoral franchise.

I. The plan should not fragment a geographically compact minority community or pack minority voters in the presence of polarized voting so as to create liability under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

(Id.) A redistricting plan was drawn and presented for comment at six separate public hearings where 200 people spoke. (Letter to DOJ.) After public comment,

4

a Revised Illustrative Plan was drawn that reduced the total population variance from 9.95 percent to 9.8 percent and made other "minimal changes" to avoid splitting certain neighborhoods.  (Id.)  Ultimately, the Revised Illustrative Plan "utilize[d] readily identifiable boundaries," "to the extent possible, maintain[ed] communities of interest and neighborhoods," "use[d] whole voting precincts to the extent practical," "was based on existing districts," resulted in "districts [that were] compact and contiguous," and  "minimize[d] retrogression majority-minority districts."  (Dkt. # 19, Ex. F.)

On September 20, 2012, the City Council adopted an ordinance approving the Revised Illustrative Plan.  (Dkt. # 19, Ex. F.)  Under the 2010 census data, the City had a population of 1,326,721; thus the ideal population for each single-member council district was 132,672.  (Letter to DOJ.)  The populations of the modified districts ranged from 126,228 to 139,227, with a maximum deviation of 9.8 percent between the smallest and largest districts:

| Adopted Revised Illustrative Plan | | |
|---|---|---|
| District[2] | Persons | Deviation |
| 1 | 126,616 | -4.56% |
| 2 | 129,002 | -2.77% |
| 3 | 127,207 | -4.12% |
| 4 | 126,702 | -4.50% |
| 5 | 126,228 | -4.86% |
| 6 | 134,410 | 1.31% |
| 7 | 139,081 | 4.83% |
| 8 | 139,169 | 4.90% |
| 9 | 139,227 | 4.94% |
| 10 | 139,079 | 4.83% |
| **Totals** | 1,326,721 | 4.94% - (-4.86%) = **9.8%** **(Maximum deviation)** |

---

[2] Plaintiff speculates that Districts 1−5, comprised of a Hispanic majority, have lower populations to give their residents a more powerful vote, and that Districts 6−10, comprised of a Non-Hispanic Anglo majority, have larger populations to dilute the votes of those residents.  (Dkt. # 22-5.)  However, Plaintiff has produced no evidence to support his speculation, and the Court has found no evidence of invidious discrimination or any improper motive behind the redistricting plan. Contrary to Plaintiff's speculation, the evidence shows Districts 6−10 are not all comprised of a Non-Hispanic majority.  For example, the evidence show that District 7 has a total Hispanic population of 67.28%, compared to a total Non-Hispanic Anglo population of 28.11%, and District 8 has a total Hispanic population of 42.89%, compared to a total Non-Hispanic Anglo population of 41.82%.  (See Letter to DOJ.)

(Letter to DOJ.)  On November 27, 2012, the Attorney General of the United States affirmatively indicated no objection to the redistricting plan pursuant to Section 5 of the Voting Rights Act of 1965, 52 U.S.C. § 10304.  (Id.)

On April 20, 2015, Plaintiff filed an Original Petition in the 57th District Court of Bexar County, Texas, challenging the redrawn districts.  ("Pet.," Dkt. # 1-1.)  Plaintiff seeks a declaration under Section 37.001 of the Texas Civil Practice and Remedies Code that the district boundaries, as modified, violate the City Charter and the U.S. Constitution.  (Id. ¶ VIII.)  Plaintiff also seeks a preliminary injunction prohibiting the City from conducting the next City Council election until the district boundaries are redrawn.  (Id. ¶ XII.)

On May 11, 2015, the City removed the action to this Court, invoking its federal question jurisdiction pursuant to 28 U.S.C. § 1331.  (Dkt. # 1.)  On August 17, 2015, the Court issued an order denying Plaintiff's motion to remand. (Dkt. # 10.)  The Court concluded it had federal question jurisdiction because Plaintiff affirmatively alleged that the present district boundaries did "not pass Constitutional muster," (Orig. Pet. ¶ VIII), and Plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.  (Dkt. # 10.)

On February 23, 2016, the City filed its Motion for Summary Judgment seeking relief from all of Plaintiff's claims.  (Dkt. # 19.)  Plaintiff filed his Motion for Partial Summary Judgment seeking a determination from the Court

that the City failed to enforce the applicable provisions of the City Charter.  (Dkt. # 22.)  Neither party filed a response.  On July 1, 2016, Plaintiff filed a supplemental memorandum of law in support of his Motion for Partial Summary Judgment.  (Dkt. # 28.)  After the hearing, Plaintiff filed a second Memorandum in Support.  (Dkt. # 30.)  The Court ordered the City to respond (Dkt. # 31) and the City filed a Motion to Strike and Memorandum in Support of its Motion (Dkt. # 32.)

## LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621

8

(5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

<u>DISCUSSION</u>

I.    Compliance with the United States Constitution

Plaintiff alleges that the City's current district boundaries "do not pass Constitutional muster and must be redrawn."  (Orig. Pet. ¶ VIII.)

A. Appropriate Constitutional Standard

The Equal Protection Clause of the Fourteenth Amendment requires a city to "to make an honest and good faith effort to construct [legislative] districts . . . as nearly as equal in population as practicable." Reynolds v. Sims, 377 U.S.

533, 577 (1964); <u>Avery v. Midland Cty., Tex.</u>, 390 U.S. 474, 480 (1968) (holding that a local government must draw its legislative districts in compliance with the Equal Protection Clause of the Fourteenth Amendment).  The Supreme Court explained that "[m]athematical exactness or precision is hardly a workable constitutional requirement" under the Fourteenth Amendment, because "it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents." <u>Id.</u>  A decade later, the Supreme Court made it clear that the constitutional standard for legislative re-districting of a state or local legislature was not governed by the stringent standards applicable to congressional districting, but instead by the equal protection test announced in <u>Reynolds</u>.  <u>Mahan v. Howell</u>, 410 U.S. 315, 324−25 (1973).

The constitutional standard applied to a city means that "somewhat more flexibility may therefore be constitutionally permissible with respect to [city] legislative apportionment than in congressional districting . . . [s]o long as the divergence from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy." <u>Reynolds</u>, 377 U.S. at 578−79.  The Supreme Court has made clear that in addition to "traditional districting principles such as compactness [and] contiguity," <u>Shaw v. Reno</u>, 509 U.S. 630, 647 (1993), other legitimate considerations may include: (1) "a state interest in maintaining the integrity of political subdivisions," <u>Harris v. Arizona</u>

Indep. Redistricting Comm'n, 136 S. Ct. 1301, 1306 (2016) (citing Mahan, 410 U.S. at 328); (2) "the competitive balance among political parties," id. (citing Gaffney v. Cummings, 412 U.S. 735, 752 (1973)); and (3) a desire to comply "with § 5 of the Voting Rights Act," id. (citing League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 518 (2006)).   Under this slightly more flexible constitutional standard, "minor deviations from mathematical equality among [local] legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Gaffney, 412 U.S. at 745.   The Supreme Court's decisions have established that a state or local government "apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations."   Brown v. Thomson, 462 U.S. 835, 842 (1983).   The Supreme Court recently affirmed the equal protection standard applicable to local legislative districts and noted its dichotomy from the strict congressional district.   See Evenwel v. Abbott, 136 S. Ct. 1120, 1124 (2016) ("[L]ocal legislative districts . . . are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives.").

B.  Application of the Appropriate Constitutional Standard

In this case, Plaintiff challenges the constitutionality of the single-member districts used to elect the City's council-members.  (Orig. Pet. ¶ VIII.) Defendant moves for summary judgment on this claim.[3]

Since Defendant is a political subdivision of the State of Texas, the Equal Protection Clause of the Fourteenth Amendment sets forth the legal standard by which Defendant must comply when drawing its single-member City Council districts.  See Reynolds, 377 U.S. at 577; Avery, 390 U.S. 479−80.  As explained previously, the Constitutional standard is that all single-member districts in San Antonio must be "as nearly of equal population as is practicable."  Reynolds, 377 U.S. at 577.  To successfully attack a state or local redistricting plan with a deviation below 10 percent, a plaintiff "must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' to which [the Supreme Court] has referred in Reynolds and later cases."  Harris, 136 S. Ct. at 1307.

Here, the City designed and implemented a re-districting plan for its city council's ten single-member districts.  The re-drawn districts are characterized

_____

[3] Plaintiff only moves for partial summary judgment on the issue of whether the City failed to comply with a provision in its Charter requiring that council-member districts be drawn "as nearly equal in population as practicable;" this will be addressed later in this order.

by a 9.8 percent deviation between the largest district and the smallest district.

(Letter to DOJ.)  Since the maximum deviation is less than 10 percent, the City's

single-member city council districts presumptively complies with the Fourteenth

Amendment.  Evenwel, 136 S.Ct. at 1124 (citing Brown, 462 U.S. at 842).  Indeed,

the Supreme Court has refused to require a state to justify a deviation of 9.9

percent.  White v. Regester, 412 U.S. 755, 764 (1973).

   Plaintiff has produced no evidence to overcome this presumption to

show that "it is more probable than not" that the 9.8 percent deviation reflects a

"predominance of illegitimate reapportionment factors."  Harris, 136 S. Ct. at

1307.  For example, Plaintiff has not produced evidence to create a genuine issue

of material fact that the instant deviation is a result of invidious discrimination, an

improper basis, or illegitimate considerations.  Instead, at oral argument, Plaintiff

seemed to imply that it was unconstitutional for the City to use a 10 percent

variance as an acceptable target.  Plaintiff's argument is grounded in the language

of the 2011 Resolution that states, "[in] no event should the total deviation in

population between the largest and the smallest district exceed ten percent."  (2011

Resolution.)  The thrust of Plaintiff's argument seems to be that no 10 percent safe

harbor rule exists, and aiming for a variance less than 10 percent suggests

arbitrariness in the overall redistricting plan.  Plaintiff also argues that the average

deviation between districts of 4.162 percent is by itself evidence of "ill intent."

(Dkt. # 30 ¶ 5.)

Plaintiff's arguments fail for a variety of reasons.  First, the Supreme

Court has held that where "the maximum population deviation between the largest

and the smallest district is less than 10%, the appellants cannot simply rely upon

numbers to show that the plan violates the Constitution."  Harris, 136 S. Ct. at

1304.  Therefore, Plaintiff cannot simply rely on the total or average population

deviations between the council-member districts as prima facie proof that the

redistricting plan fails to pass constitutional muster.  Instead, to show an improper

basis where the total deviation is less than 10 percent, a plaintiff would need to

show actual evidence such as sworn affidavits, deposition testimony, or

discoverable documents detailing such illegitimate considerations.[4]  Without actual

evidence, Plaintiff's suggestion that the numbers show "ill intent" is mere

speculation and just his theory of the case; such speculation is insufficient at

summary judgment to create a genuine issue of material fact or show that it is

"more probable than not" that the City created the Revised Illustrative Plan based

on illegitimate factors.  Harris, 136 S. Ct. at 1307.

---

[4]  For example, in Larios v. Cox, a case on which Plaintiff relies, actual evidence
in the form of "explicit admissions of witnesses" left "no doubt that a deliberate
and systematic policy of favoring rural and inner-city interests at the expense of
suburban areas [created the variances]."  300 F. Supp. 2d at 1227.

Second, Plaintiff's argument that the Revised Illustrative Plan is invalid because the City targeted a variance less than 10 percent is not supported by the facts in this case.  It is true that the Supreme Court has rejected creating a "safe harbor" rule that would provide immunity to challenges of districting decisions as long as the variance deviates below 10 percent.  Cox v. Larios, 542 U.S. 947, 949 (2004) (rejecting the invitation to create "a safe harbor for population deviations less than 10 percent, within which districting decisions could be made for any reason whatsoever").  At least one district court has suggested that a redistricting plan could be unconstitutional where the sole focus is obtaining a variance less than 10 percent, but only where the plan is "not driven by any traditional redistricting criteria such as compactness, contiguity, and preserving county lines".  Larios v. Cox, 300 F. Supp. 2d 1320, 1341-1342 (N.D. Ga. 2004) (citing Roman v. Sincock, 377 U.S. 695, 710 (1964)) (noting that all efforts to equalize populations ceased once the legislature realized the total population variance would fall below 10 percent).  The Court recognizes it may be true that if a city or state's sole redistricting criteria is that the total population variance must fall below 10 percent, then such a single criteria in a vacuum may suggest arbitrariness, a lack of good faith in re-drawing lines, and the absence of legitimate considerations.  See Roman, 377 U.S. at 710.  However, the Court need not answer this question.  Plaintiff argues that the City's stated goal to obtain a variance of less

15

than 10 percent makes the entire plan itself invalid; however, he fails to recognize that the plan is motivated not only by the goal of achieving a deviation less than 10 percent, but also by legitimate considerations and traditional districting objectives.

For example, the City has produced evidence that the 9.8 percent deviation is a result of traditional districting objectives.  The City's report to the Department of Justice demonstrates that the implemented plan "avoids any substantial retrogression of majority-minority districts."[5]  (Letter to DOJ at 6); See Harris, 136 S. Ct. at 1306 ("Members of the Court expressed the view that compliance with § 5 of the Voting Rights Act is also a legitimate consideration that can justify some deviation from perfect equality of population.").  The implemented plan also resulted in districts that were compact and of contiguous territory.  (Dkt. # 19, Ex. F at 154); See Evenwel, 136 S.Ct. at 1124 (creating geographic compact districts is a legitimate districting objective). The criteria also permitted the redistricting plan to contemplate the legitimate consideration of maintaining political party balance by preserving incumbent-constituency relations.  (2011 Resolution); Gaffney, 412 U.S. at 752 (recognizing the competitive balance among political parties as a legitimate consideration).  Further, the implemented plan did not affect voting districts, polling places, or voter registration, (Letter to DOJ at 14), which demonstrates a respect for what is

---

[5] A majority-minority district is one where the majority of the population consists of people from a protected minority class.

analogous to a political subdivision at the local level.  <u>Reynolds</u>, 377 U.S. at 579

(recognizing that traditional districting objectives include respect for political

subdivisions).  Finally, the 2011 redistricting criteria required the plan to respect

"communities of interest" by not splitting their neighborhoods.  (2011 Resolution);

<u>Sensley v. Albritton</u>, 383 F.3d 591, 596 (5th Cir. 2004) ("maintaining communities

of interest" is a traditional districting principle is (quoting <u>Abrams v. Johnson</u>, 521

U.S. 74, 92 (1997)).

Accordingly, the Court finds that the City's current single-member

City Council districts, with a maximum deviation of 9.8 percent, comply with the

Equal Protection Clause of the Fourteenth Amendment.  <u>See e.g</u>, <u>Mahan</u>, 410 U.S.

at 324−28 (holding a 16.4 percent maximum deviation permissible under the

Fourteenth Amendment in state legislative re-districting).  The evidence before the

Court indicates that the City made an honest and good faith effort to construct city

council districts that were as nearly of equal population as practicable, and that the

deviations were justified by legitimate considerations.

II.    <u>Compliance with the City Charter</u>

Plaintiff moves for partial summary judgment on the issue of whether

the City's single-member City Council districts comply with the express language

of the City Charter.  (Orig. Pet. ¶ VIII; Dkt. # 22 ¶ 1.)

Article II Section 4 of the City Charter states in relevant part, "[t]he Councilmembers shall be elected from districts or wards which shall be drawn by ordinance and shall be as nearly equal in population as practicable."  (Dkt. # 19, Ex. C.)  Plaintiff argues that the Charter's language, "as nearly equal in population as practicable," requires the City to create council-member districts in compliance with the more stringent one person, one-vote standard applied to congressional districting.  (Dkt. # 22 ¶ 8 (citing Kirkpatrick v. Preisler, 394 U.S. 526, 531).)  Defendant argues that the Charter's language is more appropriately interpreted through the Supreme Court's use of the phrase "as nearly of equal population as is practicable" in Reynolds.  (Dkt. # 19 at 6-7 (citing 377 U.S. at 577).)

"While broad discretion is given to a city in exercising its powers, a city must respect the express provisions of its charter."  Nat'l Solid Wastes Mgmt Ass'n v. City of Dallas, 903 F. Supp. 2d 446, 463 (N.D. Tex. 2012) (citing City of Austin v. Thompson, 219 S.W.2d 47, 59 (Tex. 1949)).  In Texas, "courts construe city charter provisions according to the rules governing statutory interpretation."  Id.; In re Arnold, 443 S.W.3d 269, 274 (Tex. App. 2014); Rossano v. Townsend, 9 S.W.3d 357, 363 (Tex. App. 1999).  When courts in the Fifth Circuit interpret a Texas law, the court "follow[s] the same rules of construction that a Texas court would apply − and under Texas law the starting point of our analysis is the plain language of the statute."  Wright v. Ford Motor Co., 508 F.3d 263, 269 (5th Cir.

18

2007); Prairie View A&M Univ. v. Chatha, 381 S.W.3d 500, 507 (Tex. 2012)

("The plain language of a statute is the surest guide to the Legislature's intent.").

Pursuant to this command, courts are to first "use definitions

prescribed by the Legislature and any technical or particular meaning the words

have acquired." City of Rockwell v. Hughes, 246 S.W.3d 621, 625 (Tex. 2008).

Where there is no definition or particular meaning, courts are to construe words

according to their "plain and common meaning." Id. The Texas Supreme Court

stresses that "stray[ing] from the plain language of a statute . . . risk[s] encroaching

on the Legislature's function to decide what the law should be." Id. (quoting

Fitzgerald v. Advanced Spine Fixation Sys., Inc., 996 S.W.2d 864, 866 (Tex.

1999)). The Texas Supreme Court has held "[o]nly when those words are

ambiguous do we 'resort to rules of construction or extrinsic aids.'" Entergy Gulf

States, Inc. v. Summers, 282 S.W.3d 433, 437 (Tex. 2009) (quoting In re Estate of

Nash, 220 S.W.3d 914, 917 (Tex. 2007)). In Texas, statutory interpretation is a

question of law. City of Rockwell, 246 S.W.3d at 625.

Here, it is undisputed that the City amended its Charter in 1997 to

require its council-member districts to be "as nearly equal in population as

practicable." To interpret this phrase, the Court must look at its plain meaning at

the time of its adoption. The phrase was not defined by the City Council.

However, at the time of the 1997 amendment, the meaning of the phrase "as nearly

equal in population as practicable" had acquired a particular meaning through Supreme Court case law.  Further the expressly stated purpose of the 1997 Amendment was "to update terminology to current legal usage."  (Dkt. # 19-2, Ex. B at 17.)

The phrase appears to have originated in Wesberry v. Sanders.  376 U.S. 1, 7–8 (1964).  In determining the command of Article I Section 2 of the United States Constitution as to populations in congressional districts, the Supreme Court explained that Article I Section 2 "means that *as nearly as is practicable* one man's vote in a congressional election is to be worth as much as another's."  Id. (emphasis added).  Subsequently, the Supreme Court defined the "as nearly as is practicable" standard in congressional re-districting cases to mean that "the State make a good-faith effort to achieve precise mathematical equality."  Kirkpatrick v. Preisler, 394 U.S. 526, 530–31 (1969).  During the current term, the Supreme Court reaffirmed this strict standard for congressional district populations. Evenwel v. Abbott, 136 S. Ct. 1120, 1124 (2016) ("States must draw congressional districts with populations as close to perfect equality as possible.").  Any variance, even a minor one, requires a state to justify the discrepancy with a legitimate reason.  However, subsequent Supreme Court case law makes clear that the "as nearly as is practicable" standard is wholly different as applied to the drawing of district boundaries for state and local legislative chambers. See Gaffney, 412 U.S.

20

at 741−42 ("[T]here are fundamental differences between congressional districting

under Article I [of the Constitution] and the Wesberry line of cases . . . and . . .

state legislative reapportionments governed by the Fourteenth Amendment and

Reynolds v. Sims.")

  As explained above, the Supreme Court has held that the Equal

Protection Clause of the Fourteenth Amendment requires a city to "to make an

honest and good faith effort to construct [legislative] districts . . . as nearly as equal

in population as practicable."  Reynolds, 377 U.S. at 577; Avery, 390 U.S. at 480.

The Supreme Court recognizes that the phrase "as nearly of equal population as is

practicable" in the context of state legislative districting does not require

mathematical exactness, and that in fact, such mathematical exactness would be an

unworkable constitutional requirement.  Reynolds, 377 U.S. at 577.

  Accordingly, the Court finds that at the time the City adopted the

1997 Amendment, the Constitutional phrase "as nearly of equal population as is

practicable," had acquired a particular meaning through a long line of

uninterrupted Supreme Court cases.  Id.; Gaffney, 412 U.S. at 745; Mahan, 410

U.S. at 324−25; Connor v. Finch, 431 U.S. 407 (1977); Brown, 462 U.S. at 842.

In the context of local legislative districting, as was the focus of the 1997

amendment, the meaning of the phrase "as nearly of equal population as is

practicable," meant that local legislative district populations were permitted to

deviate from mathematical precision when the deviation was justified by legitimate considerations.  Since the City Charter term "as nearly equal in population as practicable" is so similar to the Constitutional standard "as nearly of equal population as is practicable," the Court finds that the only reasonable interpretation of the City Charter language is that it imposes the same standard on the City as imposed by the Equal Protection Clause of the Fourteenth Amendment as set forth in Reynolds and its progeny.  See Gaffney, 412 U.S. at 745; Mahan, 410 U.S. at 324−25; Connor, 431 U.S. at 407; Brown, 462 U.S. at 842.  Indeed, the expressly stated purpose of the 1997 Amendment was "to update terminology to current legal usage."  (Dkt. # 19-2, Ex. B at 17.)

Plaintiff argues to the contrary, and suggests that the Charter imposes on the City the "as nearly as is practicable" stringent standard used for congressional districting as defined in Wesberry and Kirkpatrick.  376 U.S. at 7−8; 394 U.S. at 531.  Plaintiff's contention lacks merit.  First, Plaintiff presents no evidence to indicate that the 1997 Amendment was intended to impose this heightened standard.  For example, Plaintiff points to no legislative history that would indicate the purpose of the 1997 Amendment was to impose the inflexible congressional standard on the City.  Second, congressional districting receives a heightened standard in part because the command flows not only from the Fourteenth Amendment, but also from Article I Section 2 of the Constitution.

Article I Section 2 of the Constitution has no bearing on legislative districting at the local level.  Finally, the phrase "as nearly as is practicable" is not sufficiently similar to the Charter's phrase "as nearly equal in population as practicable" to convince the Court that the two mean the same thing.  Instead, this dissimilarity suggests that the Charter's term does not carry the same legal meaning of the Constitutional phrase "as nearly as is practicable."  The Court finds this conclusion further strengthened by noting, as explained above, the Charter's term "as nearly equal in population as practicable" is essentially the same as the Reynolds phrase "as nearly of equal population as is practicable."  See Reynolds, 377 U.S. at 577.

For the reasons outlined above, the Court finds that the City did not violate Article II Section 4 of its Charter when it implemented new single-member districts for its City Council.  The plain meaning of the Charter's command that districts be "as nearly equal in population as practicable" does not require mathematical exactness or precision where variances are justified by legitimate considerations.  Since the City Charter's standard is the same as the Constitutional standard as applied to local governments, the redistricting plan does not violate the City Charter because, as explained in Section I of this order, the plan does not violate the Constitution.  Accordingly, the Court finds that the City has complied with the express language of its Charter.

<u>CONCLUSION</u>

For the aforementioned reasons, the Court finds that San Antonio's city-council single-member districts neither violate the Equal Protection Clause of the Fourteenth Amendment nor the City's Charter.  Accordingly, the Court:

(1) **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 19); and

(2) **DENIES** Plaintiff's Motion for Partial Summary Judgment (Dkt. # 22).  The Court **ORDERS** the case **DISMISSED WITH PREJUDICE** in favor of Defendant.

**IT IS SO ORDERED**.

**DATE:** San Antonio, Texas, July 13, 2016.

_____
DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE